FILED
JUL 30 2007

ORIGINAL

ENTERED
JUL 31 2007
CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY Deputy Clerk

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

In re

NICOLE SIEGENBERG

Debtor.

Case No. LA 06-16263 TD

Chapter 7

MEMORANDUM OF DECISION REGARDING MOTION TO DISMISS CHAPTER 7 WITH PREJUDICE PURSUANT TO 11 U.S.C. § 707(b)(3)(A)

DATE: July 11, 2007
TIME: 10:30 a.m.
PLACE: Courtroom 1345

This matter was heard before me on July 11, 2007. Patricia Beary appeared for the Movant, Peter C. Anderson, United States Trustee, and Mark M. Sharf appeared for Debtor, Nicole Siegenberg. Upon consideration of the evidence and the briefs and argument of counsel, the following are my findings of fact and conclusions of law.

## INTRODUCTION

Nicole Siegenberg filed a chapter 7 bankruptcy on November 29, 2006. Siegenberg owes $82,597.12 in unsecured debt and $27,664 in secured debt on her car and her boyfriend's car (a 2001 BMW and a 1999 Cadillac Escalade, respectively). The United States Trustee (UST) has filed a motion to dismiss Siegenberg's chapter 7 petition as filed in bad faith pursuant to 11 U.S.C. § 707(b)(3)(A), and seeks a one year bar against refiling pursuant to 11 U.S.C. § 349(a).

I find and conclude that various factors in the evidence weigh in favor of denial of the UST's motion. For instance, a portion of Siegenberg's debt was incurred in an effort to help her family in a time of financial difficulty, and some of her debt was incurred in what I conclude was the result of legitimate efforts to gain employment. On balance, weightier factors suggest that Siegenberg's filing of the petition (a) was done with a lack of good faith on her part, indicative of abuse of the purposes of the bankruptcy code pursuant to 11 U.S.C. § 707(b)(3)(A), or, (b) under a "totality of the circumstances" analysis, constituted a showing of abuse of the bankruptcy process pursuant to 11 U.S.C. § 707(b)(3)(B). Therefore, I conclude that the UST's motion should be granted.

## FACTS

Commencing in 2000, when she was hired by Mariah Carey, a prominent entertainer, Siegenberg worked as a costumer in the entertainment industry. Her duties were to buy clothes for and costume her employer. In 2004, she lost her job with Carey and began looking for other similar employment in the entertainment industry. In order to do that she had to build a portfolio which required purchases of clothing stock totaling $9,273 in 2004. Siegenberg's statement of financial affairs indicates that she earned $10,000 in 2004.

Since 2004, Siegenberg has been employed only sporadically on temporary

jobs such as television pilots. Siegenberg asserts that when employed, she earns about $2,000 per week. Unfortunately, since 2004 she has usually been unemployed. Thus, in 2005 she earned $12,648, and in 2006 she earned $35,253.

Siegenberg lives with her parents in her parents' condominium in Pacific Palisades. In 2004 and 2005, her father, Robert Siegenberg, began experiencing knee pain. The knee pain created a financial concern for the family because without healthy knees he would not be able to install garage doors, which is how he supported his family.

In April 2006, Robert Siegenberg's knee failed and he had to undergo knee surgery. He stopped working and the family experienced a general sense of financial panic. In May, her parents decided to buy a house with the goal of upgrading it and quickly reselling it for a profit. Her parents bought the house for $750,000 and borrowed $225,000 to close the purchase and provide remodeling funds. When her parents ran into difficulty with the project, they asked Siegenberg to lend them $35,000. Siegenberg states in her declaration that she loaned her parents approximately $35,000 to complete the remodeling in return for their promise to share with Siegenberg 50% of any profits.

In January 2006, Siegenberg began dating Tony Zapata, Jr. (Zapata). That month she incurred $1,416.30 in credit card debt to pay bills on a hotel in Cabo San Lucas, Mexico, and $711.75 to pay for a rental car. In March and April 2006, she charged $14,600 in cash advances on two credit cards. All told, the analysis of Sam Lor (Lor) for the UST shows that Siegenberg spent a total of at least $6,018 in Mexico or on plane tickets to or from Mexico between January and June 2006.

Also in March 2006, a $710,000 real property sale, from which Zapata, who was a realtor, expected to earn a sales commission equal to 2.5% of the sales price, fell out of escrow. The sale never closed. About the same time, Zapata and

Siegenberg were optimistic about other financial prospects because Zapata had just listed a $6,000,000 Santa Monica home for sale. The house did not sell.

In May 2006, Siegenberg used her credit cards to incur debt as follows: $918 at a clothing store, $215 at a Goleta, California, hotel, $2,500 on a down payment on a Cadillac Escalade she bought for Zapata, $463 on a Mexicana Airlines ticket, $283 at a bike shop, $150 at a hair salon, $1,047 at a computer shop, $344 at a Malibu hotel, $233 at a Venice Beach restaurant, and $755 at Cabo San Lucas hotels. Thus, in May 2006, Siegenberg incurred at least $6,908 in credit card debt, arguably either for business purposes or for personal reasons.

In June through August 2006, she used her credit cards to pay $19,607 for various contractor services, ostensibly for the remodeling of her parents' new investment property.

In June 2006, Siegenberg used her credit cards to buy three plane tickets to South Africa for $9,099 so that she, her mother, and Zapata could visit Siegenberg's sick grandmother in January 2007. Later, her grandmother reimbursed her to the extent of $6,066. Siegenberg claims she repaid $5,500 toward the $9,099 in credit card charges shortly before the bankruptcy petition was filed.

In July 2006, Siegenberg paid $12,500 for her mother's back surgery with her credit card. On October 4, 2006 she repaid the credit card company with a check from her parents.

In July, August, and September 2006, Siegenberg traveled to Cabo San Lucas to interview for a job selling timeshares. She ultimately declined a job offer there. Lor's analysis shows credit card payments by Siegenberg totaling $1,791 for airline tickets, to and from Mexico and hotel stays during that period, including tickets for Zapata.

In August 2006, she incurred credit card debt of $342 at a hotel in Santa

Monica, California. In August and September she incurred debt of $1,387 for remodeling services. In September and October she charged $5,600 in cash advances. In October she incurred further debt of $432 on a plane ticket and expenditures of about $280 in Cabo San Lucas

Throughout the period reported, Siegenberg made expenditures of at least $7,302.67 on clothing, but was able to return $4,279.19 of clothing for credit in January of 2006.

Siegenberg's Schedule F enumerates 11 credit cards, with individual card debt ranging from $85 to $24,429. The schedule provides the opening date for eight of the accounts. Three of them were opened in 2006, one in January and two in July. The amounts of the debt on those three credit cards are, respectively, $7,670, $10,925, and $6,522.

In sum, during the period covered by Lor's analysis, May 2005 to October 2006, Siegenberg received at least $42,775 in credit card cash advances and incurred the following additional credit card debt:

    $19,607.69 on contractors,

    $12,729.60 on plane tickets (a net $7,229 after her grandmother's reimbursement, which Siegenberg forwarded to her credit card company),

    $7,302.67 on clothing,

    $5,539.01 on cars,

    $3,346.87 on hotels,

    $2,129.73 on restaurants, and

    $1,033.45 on beauty salons.

In the end, her parents' new home sold in November 2006 for $745,000, about $200,000 less than Siegenberg and her family had invested in buying and remodeling

the new home.

## DISCUSSION

In considering whether a chapter 7 case should be dismissed because granting relief would be an abuse of the provisions of chapter 7, courts may consider (a) whether the debtor filed the petition in bad faith; or (b) whether the totality of the circumstances of the debtor's financial situation demonstrates abuse. 11 U.S.C. § 707(b)(3)(A) and (B). Although the UST has moved to dismiss Siegenberg's chapter 7 pursuant to § 707(b)(3)(A) only, I conclude that § 707(b)(3)(B) also may provide a statutory basis for the relief requested by the UST.

**A. Dismissal for Bad Faith Under 707(b)(3)(A)**

Section 707(b)(3) was added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). Since BAPCPA, the Ninth Circuit has not established a standard for determining a finding of "bad faith" in chapter 7 cases under § 707(b)(3)(A). However, a few bankruptcy courts have addressed the issue. See, e.g., In re Mitchell, 357 B.R. 142 (Bankr. C.D.Cal. 2006). The court in Mitchell, a chapter 7 case, used a nine-part test borrowing both from the Ninth Circuit's pre-BAPCPA "substantial abuse" test and from chapter 11 and 13 bad faith cases. Id. at 153-156 (citing: In re Price, 353 F.3d 1135, 1139-40 (9th Cir. 2003)(using a six factor "totality of the circumstances test" to determine "substantial abuse" under pre-BAPCPA 707(b)); In re Leavitt, 171 F.3d 1219 (9th Cir. 1999)(dismissing a chapter 13 for cause under §§ 349(a) and 1307(c), after a finding of bad faith employing a four part "totality of the circumstances" test)).

The court in Mitchell considered the following nine factors in determining whether "the debtor's intention in filing bankruptcy is inconsistent with the Chapter 7 goals of providing a 'fresh start' to debtors and maximizing return to creditors" and whether the case should thus be dismissed under § 707(b)(3)(A):

1. Whether the chapter 7 debtor has a likelihood of sufficient future income to fund a chapter 11, 12, or 13 plan which would pay a substantial portion of the unsecured claims;

2. Whether debtor's petition was filed as a consequence of illness, disability, unemployment, or other calamity;

3. Whether debtor obtained cash advances and consumer goods on credit exceeding his or her ability to repay;

4. Whether debtor's proposed family budget is excessive or extravagant;

5. Whether debtor's statement of income and expenses misrepresents debtor's financial condition;

6. Whether debtor made eve of bankruptcy purchases;

7. Whether debtor has a history of bankruptcy petition filings and dismissals;

8. Whether debtor has invoked the automatic stay for improper purposes, such as to delay or defeat state court litigation;

9. Whether egregious behavior is present.

Mitchell at 154-55. To be sure, no single factor is considered dispositive, Id. at 155 (citing: In re Powers, 135 B.R. 980, 991-92 (Bankr. C.D.Cal. 1991); In re Marshall, 298 B.R. 670, 681 (Bankr. C.D.Cal. 2003)), and fraudulent intent is not required for a finding of bad faith. Id. (citing Leavitt, 171 F.3d at 1224).

**1. Likelihood that the chapter 7 debtor will have sufficient future income to fund a chapter 11 or 13 plan.** Siegenberg does not currently have income to fund a chapter 11 or 13. According to the pleadings, such future income is not foreseeable. This fact supports Siegenberg's position.

**2. Consequence of illness, disability, unemployment or other calamity.**

Siegenberg claims, in part, that the bankruptcy petition was filed as a consequence of the disability of her father. His disability and surgery in April 2006 caused financial panic in her family, in response to which her parents bought a house in the hope of remodeling it and selling it quickly at a profit. Siegenberg contributed $35,000 to remodel that investment property under an agreement that promised her 50% of the profit. However, her parents sold the home at a loss and Siegenberg received no money in return for her investment.

Siegenberg did not experience an illness, disability, new unemployment, or other calamity. On the contrary, she provides evidence of only modest improvement in her employment status for the year 2006, not enough to match her greater expenditures. There was no change in her health status after 2004.

Further, the Lor analysis suggests that Siegenberg incurred thousands of dollars of new credit card debt on plane tickets, a car for her boyfriend, hotel stays, and other consumer items that are not convincingly attributable to any reasonably, potentially revenue producing activities during May 2006, the month after her father's surgery and the month during which her parents purchased a house as an investment property, the alleged period of financial distress.

**3. Obtaining cash advances and consumer goods on credit exceeding Siegenberg's ability to repay.** Much of the argument between the two parties revolves around the question of consumer spending. The UST argues that Siegenberg purchased luxury consumer items on credit beyond her ability to repay at the expense of her creditors. Siegenberg urges in response that various expenditures were either for business purposes or were repaid.

Siegenberg asserts that she spent approximately $35,000 on her parent's residential investment; she repaid pre-bankruptcy almost two-thirds of the cost of the plane tickets to South Africa ($5,500); her parents wrote a check that she forwarded

to her credit card company to repay $12,500 for the credit card charges for her mother's surgery; her expenditures on clothing were (a) a legitimate business expense and (b) some of the clothing was returned for credit; and she traveled to Mexico for the purpose of attaining a job.

On the other hand, Siegenberg provides no detail to explain $42,775 in cash advances she received on her credit card accounts between May 2005 and October 2006. She does not provide evidence of contractor payments she claims to have made that exceeded $19,607. She does not provide corroborating detailed evidence that during the period covered by the UST's motion she used the clothing she bought for demonstrable business purposes. Regarding her Mexican expenditures, it appears that she incurred credit card debt of more than $6,000 before July 2006, but only about $2000 between July and October 2006, the period during which she claims she was interviewing for employment in Mexico. The pre-July Mexican expenditures appear to be for consumer items such as plane tickets, hotels, and restaurants for the personal pleasure of Siegenberg and Zapata, and Siegenberg offers no convincing evidence to persuade me otherwise.

Similarly, Siegenberg does not persuasively explain the reasonable business purpose of about $5,500 in car related credit card debt creating expenditures (including $2,500 on her boyfriend's Cadillac down payment), as well as $2,129 on restaurants, and about $900 on hotels in Southern California, among other consumer items.

The sum of Siegenberg's justified business or personal expenditures, including contractor expenses, reimbursed tickets to South Africa, her mother's surgery, returned clothing, and spending to pursue employment in Mexico is about $59,000. On the other hand, the sum of her unexplained and unjustified cash advances, and other credit card debt for Mexican travel spending prior to her Mexican job interviews,

on cars, Southern California hotels, and unexplained clothing expenditures is about $58,000. Further, if only the $19,607 in contractor charges that are enumerated in Lor's analysis are included in her explained expenditures, instead of her uncorroborated claim that she incurred $35,000 for such contractor charges, then her adequately explained expenditures are about $44,000 while her unexplained expenditures would appear to be about $73,000.

Whatever Siegenberg's business oriented goals, her very substantial credit card charges for consumer goods and cash advances were incurred without any reasonable or foreseeable ability to repay them. I conclude, on balance, that such charges, under the circumstances, are evidence of Siegenberg's bad faith.

**4. Excessive or extravagant proposed family budget.** Siegenberg's budget appears to be excessive. In Schedules I and J, she claims average monthly income of $2,466.58 and average monthly expenditures of $5,368.60, including $1,824 to support her parents and $560.43 for car payments, as well as $652 in regular business operating expenses. In light of the thousands of dollars Siegenberg charged on her credit cards monthly during 2006, as well as minimal credit card payments she was required to make, the gap between her monthly income and budget appears excessive and is suggestive of a lack of good faith on her part.

**5. Statement of income and expenses misrepresenting financial condition.** The UST has not alleged any misrepresentation in Siegenberg's statement of financial condition.

**6. Eve of bankruptcy purchases.** Siegenberg claims that in fact she made an eve of bankruptcy payment rather than purchases, $12,500 toward her mother's surgery, militating in favor of a finding of good faith.

On the other hand, according to her Schedule F, Siegenberg opened at least three of her 11 credit cards in 2006, one in January and two in July. She owes $7,670

on the one opened in January, $10,925 on one opened in July, and $6,522 on the other opened in July. Thus, in under four months of use, Siegenberg became indebted for $17,447 on two cards that she opened within 5 months of filing. Also, according to Lor's analysis, she charged at least $6,759 in September and October 2006, within about two months of her bankruptcy petition. These are instances of eve of bankruptcy purchases that suggest a lack of good faith under the circumstances, regardless of alleged business purpose, given the wide gaps between her earnings and her new credit card debt.

**7. Bankruptcy history.** Siegenberg does not have a history of bankruptcy petition filing and dismissals.

**8. Improper purpose for automatic stay: state litigation.** There is no evidence that Siegenberg has invoked the automatic stay for an improper purpose, such as to defeat state court litigation.

**9. Egregious behavior.** Siegenberg argues that rather than exhibiting egregious behavior, the facts illustrate bad financial luck. She points to the fact that she has had a hard time finding a job in the entertainment industry, though she has spent a lot of money trying; her family's real estate investment flopped; and the interviews for a job selling Mexican time shares turned out to be a waste of time. In the end, she claims that despite her honest efforts to improve her income, she has been unlucky and, thus, is unable to pay off her debts.

Even assuming all of what Siegenberg says is true, those factors do not justify the spending detailed above. In light of her low rate of income over a three-year period preceding bankruptcy, her sizeable consumer-oriented expenditures and unexplained cash advance debt appear to be egregious under the circumstances, rather than legitimate startup business expenses.

Thus, analysis pursuant to five of nine Mitchell factors, factors 2, 3, 4, 6, and 9,

supports a finding of a lack of good faith.

**B. Dismissal Under 707(b)(3)(B): Totality of the Circumstances**

Additionally, dismissal would appear to be appropriate under § 707(b)(3)(B), considering the "totality of the circumstances" presented by the evidence. Bankruptcy courts that have addressed § 707(b)(3) since the enactment of BAPCPA have found that the "totality of the circumstances" tests that were applicable under the former § 707(b) remain applicable under BAPCPA. Mitchell, 357 B.R. at 150, 153; In re Richie, 353 B.R. 569, 575 (Bankr. E.D. Wis. 2006). BAPCPA made changes, however, making it easier for the UST to prove a case for abuse because (a) there is no longer a presumption in favor of granting relief to a debtor, and (b) the standard for dismissal is reduced from "substantial abuse" to mere "abuse." In re Colgate, 2007 WL 1649103 at *3 (Bankr. E.D.N.Y. 2007); Mitchell, 357 B.R. at 153; Richie, 353 B.R. at 574.

The Price "totality of the circumstances" test includes the following six factors:

1. Whether there is a likelihood of future income to fund debtor's chapter 11, 12, or 13 plan;

2. Whether the petition was filed as a consequence of illness, disability, unemployment, or other calamity;

3. Whether the schedules suggest debtor obtained cash advances and consumer goods without the ability to repay;

4. Whether debtor's proposed family budget is excessive or extravagant;

5. Whether debtor's papers misrepresent his or her financial condition; and

6. Whether debtor engaged in eve of bankruptcy purchases.

Price, 353 F.3d at 1139-40.

Here, Price factors 2, 3, 4, and 6 are unfavorable to Siegenberg, indicating a

lack of good faith and supporting a conclusion of abuse under § 707(b)(3)(B).

**1. Future income to fund a chapter 11 or 13 plan.** The UST has failed to establish that Siegenberg has a foreseeable likelihood of future income to fund a chapter 11 or 13.

**2. Consequence of illness, disability, unemployment, or calamity.** This factor is unfavorable to Siegenberg because she does not present evidence that she herself experienced a grave illness, change in employment status, disability, or any other calamity that might explain the excess of her debt over her income.

**3. Cash advances and consumer goods without ability to repay.** As discussed above, Siegenberg incurred substantial credit card debt that might be considered business related or which may have been incurred in the attempt to improve her financial situation. However, a large portion of her credit card debt was incurred to acquire consumer goods and services and cash advances whose business purposes remain unexplained. Thus, on balance, this factor weighs against her.

**4. Excessive or extravagant family budget.** As discussed above, Siegenberg's monthly income is less than half of her monthly spending, which includes $560.43 on cars payments and $1,824 in support of her parents. Considering her high rate of debt accumulation, her budget is excessive and suggestive of a lack of good faith.

**5. Misrepresentation of financial condition.** The UST has not alleged any misrepresentation in Siegenberg's papers as to her financial condition.

**6. Eve of bankruptcy purchases.** As discussed above, Siegenberg opened two credit cards in July of 2006. During the four months in which those cards were in use she charged $17,447 on those two cards alone. Further, Lor's analysis describes purchases of at least $6,759 on various cards in September and October 2006. These facts are suggestive of a lack of good faith in her bankruptcy filing.

**C. Dismissal with a One-Year Bar Against Refiling**

A bankruptcy court may, for cause, dismiss a bankruptcy case with a bar against later discharge of debt. 11 U.S.C. § 349(a); Leavitt, 171 F.3d at 1223.

A finding of bad faith based on egregious behavior can justify dismissal with prejudice. Leavitt, 171 F.3d at 1224. The bankruptcy court should consider the following factors when considering barring later discharge for bad faith:

1. Whether debtor misrepresented facts in her petition, unfairly manipulated the bankruptcy code, or otherwise filed in an inequitable manner;

2. Debtor's filing history;

3. Whether debtor only intended to defeat state court litigation;

4. Whether egregious behavior is present.

Leavitt, 171 F.3d at 1224.

Here, while egregious behavior is present, the other three factors are not. There are no allegations of misrepresentation; Siegenberg has no bankruptcy history; and there has been no mention of state court litigation. Under the egregious circumstances outlined, it would appear to be appropriate to bar Siegenberg from refiling a bankruptcy petition for at least one year, as the UST has requested.

## CONCLUSION

Siegenberg has used her credit cards in various efforts to extricate herself and her family from financial difficulties. She also used her credit cards for tens of thousands of dollars in personal expenditures, the purchase of consumer goods and services, and to obtain unexplained cash advances. The record contains significant evidence of these ostensibly excessive expenditures and contains only patchy, incomplete, and unconvincing evidence that most of these expenditures were made to further Siegenberg's business efforts. Pursuant to both 11 U.S.C. §§ 707(b)(3)(A) and (B), I believe it is appropriate to grant the UST's motion to dismiss Siegenberg's chapter 7 petition, and to impose a one-year bar on future bankruptcy filings by or against Siegenberg pursuant to 11 U.S.C. § 349(a).

SO ORDERED.

DATED: July 30, 2007

THOMAS B. DONOVAN
United States Bankruptcy Judge

# NOTICE OF ENTRY OF JUDGMENT OR ORDER AND CERTIFICATE OF MAILING

TO ALL PARTIES IN INTEREST LISTED BELOW:

1. You are hereby notified that a judgment or order entitled: Memorandum of Decision Regarding Motion to Dismiss Chapter 7 with Prejudice Pursuant to 11 U.S.C. § 707(b)(3)(A) was entered on 7/31/07.

2. I hereby certify that I mailed a true copy of the order or judgment to the persons and entities listed below on 7/31/07.

United States Trustee
Ernst & Young Plaza
725 S. Figueroa St., 26th Floor
Los Angeles, CA 90017

Debtor

Nicole Siegenberg
1748 Palisades Drive
Pacific Palisades, CA 90272

Debtor's Attorney

Mark M Sharf
15821 Ventura Blvd Ste 275
Encino, CA 91436

Chapter 7 Trustee

Richard K Diamond
Danning, Gill, Diamond & Kollitz
2029 Century Park East, 3rd Floor
Los Angeles, CA 90067-2904

Dated: 7/31/07

[signature]

Clerk